Filed 1/15/14  Gill v. Varwig CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| JASBIR S. GILL et al., | C069565 |
| Plaintiffs and Respondents, | (Super. Ct. No. 39200800186222CUORSTK) |
| v. | |
| ROGER VARWIG, | |
| Defendant and Appellant. | |
| _____ | |
| JASBIR S. GILL et al., | C070505 |
| Plaintiffs and Appellants, | (Super. Ct. No. 39200800186222CUORSTK) |
| v. | |
| ROGER VARWIG, | |
| Defendant and Respondent. | |

Plaintiffs Jasbir and Parampal Gill own two parcels of agricultural property on which they have planted a vineyard.  They access a portion of their property over an unpaved route across property owned by defendant Roger Varwig.  This route is shown

1

as a road on old maps.  The Gills claim the right to use this route either because it is a dedicated public road or because they have a prescriptive easement.  This dispute arose when Varwig obstructed the Gills' access, first by means of a barbed wire "fence" blocking the unpaved route and then by digging a ditch across it.  Jasbir Gill's truck got stuck in the ditch.

The Gills filed suit against Varwig.  The trial court found in their favor, finding a public right of way or a prescriptive easement across Varwig's property.  The court issued an injunction preventing Varwig from interfering with this public right of way or easement and awarded the Gills damages, including damages for emotional distress and punitive damages.

Varwig appeals, contending substantial evidence does not support the finding of either a public right of way or a prescriptive easement, or the damages awarded.  The Gills cross-appeal from the order denying their motion for attorney fees.

As we will explain, we modify the judgment.  Substantial evidence does not support the trial court's finding of a public right of way or the award of damages for emotional distress.  The damage award for loss of use of the easement must be reduced to exclude the period of time for which there is no evidence of obstruction.  In all other respects, we affirm the judgment and the order denying attorney fees.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Properties*

The properties involved in this case are rural lots in the County of San Joaquin (the County) shown on the Map of Morse Colony recorded in 1895.  The map contains 56 lots, laid out in roughly a checkerboard pattern.  The southern boundary is designated a public highway, now known as Eight Mile Road, and the northern boundary is Morse Road.  An irrigation canal maintained by the Woodbridge Irrigation District (WID) cuts through the middle of these lots; the canal runs north to south with an angled jog.  (A branch of the WID canal, not shown on any of the maps, bisects several lots east to west,

2

crossing Lincoln Road, now called Leach Road.) The map shows Leach Road, which runs north to south just east of the western two columns of lots on the checkerboard. The Gills contend that a section of this road contains their easement or the public right of way. This section of road allowed the Gills to access those portions of two lots (lots 21 and 22) positioned south of the canal's east/west branch by passing between two of Varwig's lots (lots 10 and 23). About one-third of Lots 21 and 22 are south of the branch; two-thirds are north.

Varwig, an engineer and contractor, owns several lots in the area. So do the Gills. As relevant here, Varwig owns two lots on either side of Leach Road; these two lots are four lots north of Eight Mile Road. To the immediate west of Leach Road is Lot 10, which Varwig has owned since 1996, and to the immediate east of the road is Lot 23, which he purchased in 2002. Varwig's house is on Lot 10. Directly north of Lot 23, and also to the immediate east of Leach Road, is Lot 21 and directly east of this lot is Lot 22. The Gills own both of these lots, as well as others in the area.

Leach Road is paved north of Eight Mile Road. The paved road ends just south of Varwig's Lots 10 and 23, more than a full lot south of the Gills' Lots 21 and 22. As one travels north on Leach Road there are three signs. One indicates the road ends in 500 feet; another says "not a through road;" at the end of the paving a sign reads, "End County Maintained Road." In short, the disputed property is the unpaved portion of Leach Road, running between Varwig's Lots 10 and 23 and traveling north to the irrigation canal branch that bisects the Gills' Lot 21 and Lot 22 to the east.

*History of the Properties*

The Morse Colony Map was recorded in 1895. The map includes the following offered dedication: "I hereby dedicate the streets, avenues, roads and alleys as shown on this map for use to the public forever." In the 1970's, the County accepted the dedication of Leach (formerly Lincoln) Road 1250 feet north of Eight Mile Road (the paved

3

portion). There is no evidence that the County ever formally accepted the dedication of the portion of Leach Road further north to the canal branch (the unpaved portion).

A parcel map recorded in the 1970's shows Leach Road and notes that Leach Road is "not open on the ground" south of the canal branch. In the opinion of Varwig's expert surveyor and engineer, this means the road "does not exist."

James Formento previously owned Lots 21, 22, and 23, the lots to the east of Leach Road. He had been an assistant assessor.

The Gills are both medical doctors from agricultural families. They own a number of agricultural parcels in the County. They rented Lots 21 and 22 in 1998 and purchased the lots two years later from Formento. Jasbir Gill understood that he could access the portions of Lots 21 and 22 that were south of the canal branch by way of Leach Road, including the unpaved portion of the road between Varwig's Lot 10 and Lot 23. The Gills began planting a vineyard on Lots 21 and 22 in 2002. The first harvestable crop was in 2005. Gill claimed he used Leach Road to access his property every year from 2002 through 2006 without any objection by the owner of Lots 10 and 23.

*Events of August 2007*

The Gills first had problems accessing the southern portions of Lots 21 and 22 by means of Leach Road in August of 2007. On August 18, Gill had to cut a barbed wire that was strung between two poles across the road to access his property. Immediately thereafter, he reported to the police that his access was obstructed. Varwig claimed the barbed wire "fence" was there when he purchased the property. Gill did not "recollect" seeing the fence before. The fence obstructed the entire width of the alleged right of way.

On August 20, 2007, Gill was driving his truck about 20 miles per hour on the unpaved portion of Leach Road. He came to an abrupt stop and his truck got stuck in a ditch. The ditch was a trench filled with water and camouflaged with weeds. Gill was

4

confused and suffered some chest pain.[1]  He was in a "little shocky state" and called his manager to come help him.  The manager took Gill home.

Varwig complained to the sheriff about Gill's stuck pickup truck.  The sheriff went to see Gill.  After Gill explained about the ditch, he thought the sheriff was satisfied with his explanation.

Varwig claimed he had discovered a leaky water pipe on August 18 and his son put up caution tape in the area where the barbed wire had been cut.  To repair the water line, Varwig dug a 40-foot ditch, using a back hoe, and replaced the pipe.[2]  The irrigation line went to the end of the fence.  Varwig filled the trench with existing dirt, compacted the dirt using a wheel roller, and restrung the caution tape.  He did not water the ground as it was already wet.  Varwig claimed Gill removed the caution tape before he crossed the area.  Varwig took pictures of the accident, but did not offer assistance or have any conversation with Gill.  The pictures showed the front wheels of Gill's truck caught in a ditch and a pile of yellow tape nearby.

After this ditch incident, Gill was very concerned about whether he would be able to harvest his grapes.  He suffered anxiety and sometimes lost sleep.  After Gill sought legal advice, Varwig relented and allowed Gill access to his property to complete his harvest in 2007.

---

[1] Varwig objected to any testimony about Gill's injuries because Gill had refused to address his physical or emotional injuries in his deposition.  After reviewing the deposition, the trial court found Gill had withdrawn any claim for physical injuries, but he would be allowed to testify about emotional distress.  The court noted the emotional distress had to be "severe."

[2] Leach Road is 40-feet wide, the same width as the trench, which Gills' attorney sarcastically referred to as a "lucky coincidence."  He claimed Varwig had dug a "tank trap" and caught his client.

5

*Subsequent Events*

Gill again became concerned about his ability to access the southern portion of Lots 21 and 22 from Leach Road in the spring of 2008 when work in the vineyard was about to resume. Gill's concern arose in March or April because Varwig had placed some rocks in the access to the vineyard. Varwig had also planted corn in the right of way in 2008.

Gill went to the WID to see if something could be done so he could have adequate access to the southern portions of Lots 21 and 22 without the need to travel the unpaved portion of Leach Road. The WID widened an existing bridge over the canal from Pearson Road (which borders the Gill's property to the east) to the southern portion of Lot 22 to permit access by large harvesting machinery. The WID finished construction of the widened bridge within two weeks after Gill contacted them and charged the Gills $3,506 for the construction. Gill testified the route to lots 21 and 22 over Leach Road was much safer for transporting large harvesting equipment than was the route from Pearson Road over the widened bridge.

*The Lawsuit*

On June 12, 2008, the Gills filed suit against Varwig. The complaint sought a temporary restraining order, and a preliminary and permanent injunction to prevent Varwig from interfering with the Gills' easement across Varwig's property. The complaint also sought to quiet title to the easement. The Gills claimed an easement by operation of law due to necessity alleging that there was no other reasonable alternative for access to their property. The complaint alleged that the Gills' property and Varwig's property had previously been under common ownership. When part of the property was conveyed to the Gills and part to Varwig, the Gills had no access to their property other than the easement across Varwig's property.

Three months later, the Gills filed a first amended complaint (FAC). The FAC alleged that when the Gills bought Lots 21 and 22, the seller (and former owner of Lot 23

6

as well), Formento, told them that Lot 23 had been sold to Varwig with the understanding that there was an access easement across it so that the southern portions of Lots 21 and 22 could be farmed.  The Gills claimed an easement across Varwig's property under three theories:  (1) a public right of way; (2) an implied easement according to the oral agreement at the time of sale of Lot 23;[3] and (3) strict necessity as there was no other reasonable alternative for access to the Gills' property.  The FAC sought damages, including for emotional distress, as a result of Varwig's obstruction and interference with the easement, and punitive damages for Varwig's willful and oppressive conduct.  Finally, the FAC sought to quiet title in the Gills to a 15-foot wide easement across Varwig's property.[4]

Varwig moved for a judgment on the pleadings or nonsuit.  He asserted that the Gills now claimed, in their settlement statement, an easement by public dedication.  He contended that the Gills had failed to join the County as an indispensible party, so the suit should be dismissed.

The trial court denied the motion, finding the County was not an indispensible party.

*The Trial*

At trial, the Gills claimed an easement over Varwig's property either as a dedicated public right of way or an easement by prescription.  During trial, the trial court permitted the Gills to amend the FAC to allege an easement by prescription.  Varwig

---

[3]  The Gills abandoned this theory of an oral easement.  "An easement creates a present incorporeal interest in real property that is subject to the statute of frauds and is protectable, irrevocable, and compensable."  (6 Miller & Starr, Cal. Real Estate (3d ed. 2001, Supp. 2006) § 15:2, p. 15-11.)  Under the statute of frauds, an agreement for an interest in real property must be in writing to be valid.  (Civ. Code, § 1624, subd. (a)(3).)

[4]  The trial court found a prescriptive easement of 40 feet.  There is no issue on appeal as to the scope of the easement.

7

objected to the continuing change in theories, complaining it was "like trying to pin jello on the wall."

Gill testified he had used Leach Road for access to his property without objection from 2002 until August 2007. He claimed he had traveled up Leach Road from Eight Mile Road to the canal branch "for many years, seven years." The trial court sustained Varwig's objection to Gill's attempt to testify that Formento had told him such use of the unpaved portion of Leach Road had been ongoing for 50 years.

Varwig testified Gill was able to access the southern portion of his properties with harvesting equipment over the existing concrete bridge even before the new culvert bridge was installed, and had done so in 2007. There was now a locked gate across this bridge which Varwig's son had installed, but Varwig did not own the property. Varwig testified that from 1998 until 2007 he never saw Gill on Leach Road. Varwig had once seen a young man on a minibike on Leach Road and occasionally people left trash there. WID personnel "possibly" used the road to access the canal branch. People walked along the levy by the canal branch to "fish and crawdad." Varwig put a chain link fence around his property for security.[5]

Gill never told Varwig that he thought he had access rights. Varwig saw Sammy, Gill's foreman, but they never discussed an easement. Varwig testified he told Sammy he did not want them (Gill's employees) crossing over his property.

*Statement of Decision*

In its statement of decision, the trial court found "there exists an accepted dedication of the disputed easement through public use." The court found it "clear" that if Formento had been willing to pay to pave the northern part of Leach Road, the County would have accepted the dedication of it, but Formento "likely" felt no need to incur that

---

[5] The engineer and surveyor hired by the Gills testified this chain link fence did not infringe upon the alleged easement, except when the fence went around an oak tree.

expense. "Likely access was made by members of the public looking for crawfish in the canal" and by WID maintenance personnel. "The Court finds that what was likely originally a dirt road in 1895 was accepted by public use and travel."

The court further found that "[i]f plaintiffs did not have entitlement to use of the land . . . as a member of the general public, they would hold a prescriptive easement in said land in that the five-year period of use by the Plaintiffs was completed before" the August 18, 2007 incident.

The court found that Varwig's "wrongful complete deprivation of use of the easement began on August 18, 2007" when Varwig strung a piece of barbed wire across the easement. Afterwards, Varwig "created a modest 'tank trap'" and Gill's vehicle was caught. From that date, Varwig "continuously denied Plaintiffs use of the right of way/easement."

The court found a mandatory and prohibitive injunction was necessary to restore the condition of the easement. It awarded to the Gills compensatory damages of $50 per day from August 22, 2007[6] until the date of entry of judgment, a total of $72,300. The court also awarded the Gills damages for the cost they paid for the bridge that the WID constructed ($3,506) and for the expense of providing a legal description of the easement ($3,820). The court awarded $50,000 for Gill's emotional distress. The court found Varwig acted with malice and oppression on August 22, 2007, so an award of punitive damages was appropriate. A bifurcated trial was to be held on Varwig's financial condition. Costs were awarded to the Gills and "[a]ny application for attorneys fees pursuant to Code of Civ. Proc., § 1021.9 will be considered on noticed motion."

---

[6] Although the evidence shows the date of the "tank trap" incident as August 20, the trial court used the date of August 22.

9

*Punitive Damages*

At the hearing on punitive damages, held April 18, 2011, Varwig testified the balance on his home mortgage was $405,452.76 and his house was currently worth $400,000 to $450,000. The tax assessment had been lowered in July 2010 to $468,452. In a loan application in December 2008, Varwig placed the value of his home at $650,000. He testified he did not correct this figure because he was "under duress[,] I needed money to live." Varwig's tax returns for 2008 showed rental income of $69,000 and income of $17,475 from a neighbor's orchard that he farmed. Varwig's 2009 tax return showed gross income from farming of $26,516. He owned small tools and equipment, and a 2003 Ford truck with 125,000 miles on it. His company owned a 2001 truck with 225,000 miles on it. The company was close to the limit on two credit lines and had accounts payable of $123,000. Varwig had paid $300,000 for Lot 23 and $140,000 for Lot 25; he estimated their current value as about $125,000 each.

The court awarded $35,000 in punitive damages.

*Motion for New Trial*

Varwig moved to vacate the judgment and to enter a different judgment. He also moved for a new trial on the basis of insufficient evidence and excessive damages.[7]

The court denied these motions and Varwig appealed.

*Motion for Attorney Fees*

The Gills moved for attorney fees pursuant to Code of Civil Procedure section 1021.9. They sought fees of $65,779.50 and costs of $1,593.09.

---

[7] "A failure to timely move for a new trial ordinarily precludes a party from complaining on appeal that the damages awarded were either excessive or inadequate, whether the case was tried by a jury or by the court. [Citation.]" (*Jamison v. Jamison* (2008) 164 Cal.App.4th 714, 719.)

10

The trial court denied the motion, finding that the Gills failed to give notice of a demand for attorney fees in their pleadings and there was no damage to crops under cultivation as contemplated by Code of Civil Procedure section 1021.9.

The Gills separately appealed from this order.

## DISCUSSION

### I

### *Public Dedication*

A. *The Law*

 "A dedication is the transfer of an interest in real property to a public entity for the public's use." (*Fogarty v. City of Chico* (2007) 148 Cal.App.4th 537, 543.) "Dedication of private property for public use requires an offer of dedication by the owner and an acceptance of the offer by the public entity. [Citations.]" (*Ackley v. City Etc. of San Francisco* (1970) 11 Cal.App.3d 108, 112.) A statutory dedication is effected when the public agency accepts the offer of dedication. (*Scott v. City of Del Mar* (1997) 58 Cal.App.4th 1296, 1302.) "[A] failure to complete a statutory dedication does not negate the possibility of a common law dedication." (*Hanshaw v. Long Valley Road Assn.* (2004) 116 Cal.App.4th 471, 474.) When the public uses the land for the offered purposes over a reasonable period of time, there is an implied acceptance of the offer of dedication without any formal action by governmental authority. (*Biagini v. Beckham* (2008) 163 Cal.App.4th 1000, 1009 (*Biagini*).) The extent and character of the public use must be commensurate with the nature of the property dedicated. (*Biagini, supra,* 163 Cal.App.4th at p. 1011.)

"Hence, a dedication, like a contract, consists of an offer and acceptance, and it is settled law that a dedication is not binding until acceptance, proof of which must be unequivocal [citation]. The acceptance may be actual or implied. It is actual when formal acceptance is made by the proper authorities, and implied, when a use has been

11

made of the property by the public for such a length of time as will evidence an intention to accept the dedication." (*County of Inyo v. Given* (1920) 183 Cal. 415, 418.)

The burden of proving an implied dedication is on the party seeking to establish it. (*Robas v. Allison* (1956) 146 Cal.App.2d 716, 720.) Whether there was an implied acceptance of an offer of dedication is a question of fact and we review the trial court's findings of fact for substantial evidence. (*Biagini, supra,* 163 Cal.App.4th at p. 1010.) "To be substantial, the evidence must be credible and of solid value. [Citation.] 'While substantial evidence may consist of inferences, such inferences must be "a product of logic and reason" and "must rest on the evidence" [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding.' [Citations.]" (*Casella v. SouthWest Dealer Services, Inc.* (2007) 157 Cal.App.4th 1127, 1144.)

B. *Analysis*

The trial court found there was an accepted dedication of the public easement by public use. Varwig contends substantial evidence does not support this conclusion because the court relied on speculation. We agree.

The court found there had been public use of *all* of Leach Road, establishing acceptance of the dedication. The court posited the "likely reason" for the paved road to end before the Gills Lot 21 was that Formento, who previously owned Lots 21, 22, and 23, "likely" felt no need to bear the expense of paving the road. The court found it "clear" that if Formento had been willing to pay for the paving, the County would have formally accepted the dedication in its entirety. Further, there was "likely" access by members of the public. Citing the "events likely to exist" in 1895 when the map was recorded and the need for access across neighboring properties, the court concluded "that what was *likely* originally a dirt road in 1895 was accepted by public use and travel across the road even if the County did not formally accept the offer of dedication at that time."

12

As the repeated use of the word "likely" shows, the court's conclusion is based entirely on speculation. "While substantial evidence may consist of inferences, such inferences must *rest on the evidence*; inferences that are the result of speculation or conjecture cannot support a finding. [Citation.]" (*In re Precious D*. (2010) 189 Cal.App.4th 1251, 1259, italics added.) There was no evidence that Formento (or anyone else) was required to pay for paving the relevant portion of Leach Road for the County to accept its dedication, or that the County would accept a road dedication only if the road were already paved.[8] Rather, the evidence suggests there was no *need* for a public road in that particular area because it accessed only the private property of one person, obviating the need for any public access.

Nor did the Gills provide substantial evidence of current public use of the unpaved Leach Road to show acceptance by public use. The evidence of current use was practically nonexistent. Varwig saw a man on a minibike on the road just once and occasionally someone dumped garbage on the road. These limited uses are not commensurate with the dedication of a road. (*Biagini, supra,* 163 Cal.App.4th at p. 1011.) Varwig saw people on the canal's levy, fishing and looking for crayfish, but there was no evidence that these people had accessed the levy using the unpaved portion of Leach Road--there were other means of access. Varwig testified WID personnel "possibly" used the road to access the irrigation canal. They had access to the canal branch from Pearson Road and Varwig had seen them use Leach Road north of the canal. But there was no evidence WID personnel routinely used the unpaved portion of Leach Road. There *was* evidence that Gill and his employees used that portion of the road. Gill testified he had used it to access the southern portion of his properties for seven years.

---

[8] The trial court cited a resolution in which the County approved agreements with Formento and others to pay for road construction on Leach Road. The court cited Exhibit AA, but this resolution is not part of the Exhibit AA in the record.

13

As *Biagini, supra,* 163 Cal.App.4th 1000, explains, however, this use is insufficient to constitute acceptance of the dedication by public use.

At issue in *Biagini* was the sufficiency of the evidence of public use to show acceptance of a dedication of a road. The road was commonly used by business clients of two adjoining property owners. Both property owners had express private easements over the road. (*Biagini, supra,* 163 Cal.App.4th at pp. 1011-1012.) This court found the clients' use was not a sufficient public use to constitute acceptance of the dedication. (*Id.* at p. 1013.) We reasoned that a dedication is in the nature of an estoppel and is a matter between the owner and the public, not between the owner and individuals. "Thus, where the public at large relies on an offer to dedicate land to public use to such an extent that it would be unfair under principles of estoppel to deny the public continued use of the land for that purpose, implied acceptance of the offer of dedication will be found." (*Id.* at p. 1012.) Since the use of the road by the clients of adjoining landowners was not beyond the scope of the private easements and these easements would continue to permit the same access, "the conclusion that an implied acceptance of the Beckhams' offer of dedication never occurred results in no injustice or unfairness, and thus the fundamental basis for finding such an acceptance does not exist." (*Id.* at p. 1013.)

Here, of course, the Gills have no express easement. We conclude *post*, however, that they do have a prescriptive easement over the unpaved portion of Leach Road. Since their use of the road does not exceed the scope of the prescriptive easement and the prescriptive easement will allow for access to the Gills' property, "the fundamental basis for finding such an acceptance does not exist." (*Biagini, supra,* 163 Cal.App.4th at p. 1013.)

Varwig contends the trial court erred in finding the County was not an indispensible party because the declaration of a public right of way would affect the County's rights and obligations. He also contends that Code of Civil Procedure section 771.010, providing a conclusive presumption that a proposed dedication was not accepted

14

if certain conditions are met, applies. Because we have found that substantial evidence does not support the trial court's finding of a public right of way due to acceptance of the road dedication by public use, we need not address these contentions.

## II

### *Prescriptive Easement*

A. *The Law*

"A prescriptive easement is established by use of land that is (1) open and notorious, (2) continuous and uninterrupted, and (3) adverse to the true owner, and that is all of these things (4) for a period of five years. [Citations.]" (*Windsor Pacific LLC v. Samwood Co., Inc*. (2013) 213 Cal.App.4th 263, 270; see Civ. Code, § 1007; Code Civ. Proc., § 321 [five-year period].) "The purpose of these requirements is to insure that the owner of the real property which is being encroached upon has actual or constructive notice of the adverse use and to provide sufficient time to take necessary action to prevent that adverse use from ripening into a prescriptive easement. [Citations.]" (*Fogerty v. State of California* (1986) 187 Cal.App.3d 224, 238 (*Fogerty*).)

"'The actual use required depends on the nature of the easement. It need not be used every day during the prescriptive period. The use is sufficient if it occurs on those occasions when it is necessary for the convenience of the user.' [Citation.]" (*Fogerty, supra*, 187 Cal.App.3d at p. 239.) For example, use of a water ditch only when needed during the growing season is sufficient for continuous use. (*Hesperia Land & Water Co. v. Rogers* (1890) 83 Cal. 10, 11.) "The requirement means that there be no break in the essential attitude of mind required for adverse use rather than that the use be constant." (*Zimmer v. Dykstra* (1974) 39 Cal.App.3d 422, 432 (*Zimmer*).)

The party seeking to establish a prescriptive easement has the burden of proof of doing so by clear and convincing evidence. (*Brewer v. Murphy* (2008) 161 Cal.App.4th 928, 938.) "The higher standard of proof demonstrates there is no policy favoring the establishment of prescriptive easements." (*Grant v. Ratliff* (2008) 164 Cal.App.4th 1304,

15

1310.)  "Whether the elements of prescriptive use have been established is ordinarily a question of fact, reviewed under the substantial evidence standard.  [Citation.]" (*Aaron v. Dunham* (2006) 137 Cal.App.4th 1244, 1250.)  Such review requires that we resolve all conflicts in the evidence in favor of the prevailing party, here the Gills, and that we view the evidence in the light most favorable to the Gills.  (*Zimmer, supra,* 39 Cal.App.3d at p. 431.)  "If there is any substantial evidence to support the judgment, it must be affirmed.  [Citations.]" (*Ibid*.)  The testimony of a single witness, even that of a party, may provide substantial evidence.  (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.)

　　B.  *Analysis*

　　Here, Varwig and Gill presented two starkly different versions of events.  Varwig testified the barbed wire fence that Gill cut to gain access had been on Varwig's property when he bought it; he had never seen Gill or his employees use the road; Gill never claimed a right to use the road and his manager never mentioned an easement; and Varwig told Gill's manager he did not want them crossing his property.  In sharp contrast, Gill testified he had used the unpaved portion of Leach Road for seven years without any objection.  He had planted vineyards on Lots 21 and 22 and harvested them for several years.  He claimed these activities required the access of Leach Road.  Gill provided pictures that showed deep tire tracks on the disputed easement to show its use as a road.  Although Varwig contends that Gill's report to the police when he cut the barbed wire shows Gill knew he did not have permission or a right to be on the road, Gill testified he made the report because his lawful access was obstructed, not to report that he was trespassing.

　　Varwig contends the Gills failed to establish by clear and convincing evidence that he had notice of their adverse use.  His argument, however, relies mostly on his testimony and discounts Gill's testimony as "self-serving."  It was for the trial court to determine the credibility of the witnesses and resolve any conflicts and inconsistencies in their testimony.  (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 334 (*Sav-*

16

*On Drug Stores*).) "[T]he testimony of a witness offered in support of a judgment may not be rejected on appeal unless it is physically impossible or inherently improbable and such inherent improbability plainly appears. [Citation.]" (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1204.) Gill's testimony was not inherently improbable and the trial court was entitled to accept it over Varwig's testimony. If Gill and his employees used the road at issue, Varwig had notice of such use because his residence was close to that road.

In his reply brief, Varwig contends Gill did not establish a five-year, continuous adverse use because he used the disputed easement for only a few days each year. As we have explained, to be continuous, the use need not be constant. "'The use is sufficient if it occurs on those occasions when it is necessary for the convenience of the user.' [Citation.]" (*Fogerty, supra*, 187 Cal.App.3d at p. 239.)

Varwig further contends Gill's use prior to December 2002, when Varwig acquired Lot 23, was not adverse because Gill believed he had permission from the prior owner to use the easement. Gill testified only that he understood he could obtain access to his property through Leach Road, not that he had the owner's *permission* to do so. Varwig contends that Gill's understanding "is equivalent to having permission" and a permissive use is not adverse. But Gill testified only that he used the disputed easement without the owner's objection, not that he sought or obtained permission. The failure to request permission may be sufficient to prove the use of the property was under a claim of right. (6 Miller & Starr, Cal. Real Estate, *supra,* § 15:32, p. 15-123.)

Substantial evidence supports the finding of a prescriptive easement. Because we find the evidence supports only a prescriptive easement and not acceptance of a public dedication, we need not address Varwig's contention that the trial court's declaration of both a public right of way and a prescriptive easement is legally inconsistent.

17

## III

### *Damages for Loss of Use*

A. *The Law*

The owner of an easement "may maintain an action for the enforcement of this intangible right and may recover damages from a party for obstructing the easement. [Citations.]  Awardable damages compensate the plaintiff for loss of use of the easement and the diminished value of the lot it benefited." (*Kazi v. State Farm Fire & Casualty Co.* (2001) 24 Cal.4th 871, 881.)

"When a person interferes with the use of an easement he deprives the easement's owner of a valuable property right and the owner is entitled to compensatory damages. The interference is a private nuisance and the party whose rights have been impeded can recover damages as measured in the case of a private nuisance.  [Citations.]  Damages may be recovered for diminution of the property's value and for annoyance and discomfort flowing from loss of use.  [Citations.]" (*Moylan v. Dykes* (1986) 181 Cal.App.3d 561, 574 (*Moylan*).)

In *Moylan*, the defendant constructed a fence across an easement, which denied each plaintiff access to his or her property; these property owners were unable to sell their property or, as one testified, to "do anything with it." (*Moylan, supra,* 181 Cal.App.3d at p. 574.)  Defendants contended plaintiffs suffered no damages because the properties increased in value during the years when plaintiffs were denied access.  The court found plaintiffs' damages, although intangible, were real.  "The fact remains that plaintiffs were wrongfully deprived of access to their properties for a period of several years.  The trial court fixed plaintiffs' damages at $3 per day.  That amount was not excessive.  The trial court did not abuse its discretion in assessing plaintiffs' damages as it did.  We find no error." (*Ibid.*)

18

B.  *Analysis*

Here, the trial court awarded the Gills damages of $50 per day from August 17, 2007 to the date of judgment for loss of use of the easement.[9]  The total amount of these damages was $72,300.

Varwig contends the evidence does not support this award of damages.  First, he contends the Gills are entitled to damages only for the intermittent period when they actually used their property, a period Varwig identifies as only the harvest.  We disagree that damages should be limited to the days of the harvest.  Gill or his employees went to the property at other times, to check on the property or perform pruning and other agricultural activities.  Indeed, Gill was going to his vineyard on both August 18 and August 20, 2007 when impeded by Varwig, and the harvest that year was not until September.  Varwig cites no authority that damages for loss of use are limited to days when plaintiff can show he would have used the easement if not for the obstruction.  The *Moylan* court did not limit damages to certain days or require specific proof of intent to use for each day.

Next, Varwig contends that the Gills were required to mitigate damages and alternative routes were available.  The Gills *did* mitigate their damages.  By asking WID to widen the bridge so they could access the southern portion of their properties from Pearson Road, they were able to use that route for the 2008 harvest.  Had they not done so, Varwig might be facing increased damages for loss of the crop.  Varwig provides no authority, and we have found none, that an easement providing a right of way necessarily terminates when alternate access is available.  (See Civ. Code, § 811 [modes of extinguishing easements].)  Regardless of the availability of other routes to access their

---

[9]  Varwig does not challenge the $50 per day figure.

19

property, the Gills were entitled to damages for "for annoyance and discomfort flowing from loss of use. [Citations.]" (*Moylan, supra,* 181 Cal.App.3d at p. 574.)

We do find, however, that the evidence does not fully support the award of damages. The trial court found that after August 22, 2007, Varwig "continuously" denied the Gills' use of the right of way. The evidence does not support this finding. Gill testified that after he contacted an attorney, Varwig "relent[ed]" and allowed him to use the right of way to harvest his property in 2007. Gill had no concern about use of the right of way until the next spring, March or April, when Varwig placed rocks in the access to the vineyard and planted corn in the right of way. The evidence is not exact as to the time frames, but a fundamental rule of appellate review requires that we resolve all ambiguities in favor of the judgment. (*Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 755-756; accord *Denham v. Superior Court of Los Angeles County* (1970) 2 Cal.3d 557, 564.) We find that from September 2007, when the 2007 harvest took place, until March 2008, when the Gills' concerns returned, there was no evidence that Varwig obstructed the Gills' easement. Accordingly, the damages for loss of use must be reduced by $9,100 (182 days times $50).

IV

*Damages for Widening WID Bridge*

Varwig contends there is no basis in law or the evidence for the trial court's award of $3,506 for the Gills' payment to WID to widen the culvert bridge over the WID canal near Pearson Road. He argues that Gill chose to plant a crop whose harvesting equipment required a wider wheelbase than his access accommodated. He contends the widened bridge benefitted only the Gills, so it was unfair to charge him with the cost, and such damages were duplicative of the loss of use damages.

"The doctrine of mitigation of damages holds that '[a] plaintiff who suffers damage as a result of either a breach of contract or a tort has a duty to take reasonable steps to mitigate those damages and will not be able to recover for any losses which could

20

have been thus avoided' [Citations.]" (*Valle de Oro Bank v. Gamboa* (1994) 26 Cal.App.4th 1686, 1691.)  The Gills complied with that duty by finding an alternate access to permit harvesting their crops after Varwig blocked their easement.  In doing so, the Gills avoided the greater damages for loss of their crop.  Accordingly, they are entitled to recover as damages the lower cost of the mitigation.  (See *AIU Ins. v. Superior Court* (1990) 51 Cal.3d 807, 833 [costs that are "mitigative" in nature constitute damages in ordinary terms]; *CUNA Mutual Life Ins. Co. v. Los Angeles County Metropolitan Transportation Authority* (2003) 108 Cal.App.4th 382, 386 [in eminent domain proceeding property owner is entitled to recover reasonable costs incurred to mitigate damage even if post-mitigation events indicate there would have been no damage].)

V

*Damages for Emotional Distress*

A.  *The Law*

"[R]ecovery for emotional distress caused by injury to property is permitted only where there is a preexisting relationship between the parties or an intentional tort. [Citation.]" (*Lubner v. City of Los Angeles* (1996) 45 Cal.App.4th 525, 532.)  The elements of a cause of action for intentional infliction of emotional distress are: (1) extreme and outrageous conduct by the defendant; (2) done with the intention to cause, or with reckless disregard of the probability of causing, emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of emotional distress.  (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050 (*Hughes*).)  To be outrageous, the conduct "'must be so extreme as to exceed all bounds of that usually tolerated in a civilized community.' [Citation.]" (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 1001 (*Potter*).)  The defendant must have intended to inflict injury or acted with the realization that injury would result.  (*Ibid.*)

A plaintiff may recover damages for intentional infliction of emotional distress if the distress is severe, regardless of whether the plaintiff suffered any physical injury.

21

(*Hailey v. California Physicians' Service* (2007) 158 Cal.App.4th 452, 476.)  "Severe emotional distress means '"emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it."' [Citations.]"  (*Potter, supra,* 6 Cal.4th at p. 1004.)

Whether Gill suffered severe emotional distress is a question of fact and the trial court's finding will be upheld if supported by substantial evidence.  (*Fletcher v. Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 397.)

B.  *Analysis*

The trial court awarded the Gills $50,000 for emotional distress for Varwig's intentional act of willfully and maliciously creating a "tank trap" that he reasonably believed Gill would hit.  Varwig contends there was no evidence of *severe* emotional distress.  Gill had no claim of physical injury and testified only generally that he had anxiety and sometimes lost sleep.  Varwig contends this evidence is insufficient to support an award of damages for severe emotional distress.  We agree.

In *Wong v. Jing* (2010) 189 Cal.App.4th 1354 (*Wong*), a pediatric dentist sued for severe emotional distress caused by a negative on-line review criticizing her dental services.  Wong claimed the review "'was very emotionally upsetting to me, and has caused me to lose sleep, have stomach upset and generalized anxiety.'"  (*Wong, supra,* 189 Cal.App.4th at p. 1377.)  The appellate court found this "minimal showing" was insufficient to constitute severe emotional distress.  (*Ibid.*)

The *Wong* court relied on *Hughes*, *supra*, 46 Cal.4th 1035.  (*Wong, supra,* 189 Cal.App.4th at p. 1377.)  There, plaintiff sued a trustee for intentional infliction of emotional distress, claiming he made sexually explicit and threatening comments which in effect demanded sex in return for granting her requests for funds from a trust for her minor son.  (*Hughes, supra,* 46 Cal.4th at p. 1040.)  In affirming summary judgment, our Supreme Court held "plaintiff's assertions that she has suffered discomfort, worry, anxiety, upset stomach, concern, and agitation as the result of defendant's comments to

22

her . . . do not comprise "'"emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it.'"" [Citation.]" (*Id*. at p. 1051.)

Here, the evidence of Gill's emotional distress was similar to and no greater than that found insufficient in *Wong* and *Hughes*. Accordingly, we reverse the award of damages for emotional distress. Because we find the evidence is insufficient to support the award of damages, we need not consider Varwig's further argument that Gill was not entitled to recover for emotional distress under *Kelly v. CB&I Constructors, Inc.* (2009) 179 Cal.App.4th 442, because he was not a resident or occupant of the land.

VI

*Punitive Damages*

A. *The Law*

Civil Code section 3294, subdivision (a) provides: "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." The statute defines "malice" as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Civ. Code, § 3294, subd. (c)(1).) "Oppression" means "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (Civ. Code, § 3294, subd. (c)(2).)

Punitive damages are available for malicious interference with an easement. In *Zimmer, supra,* 39 Cal.App.3d at pages 438-439, the appellate court upheld an award of $1500 in punitive damages for maliciously constructing a fence across an easement.

The purpose of punitive damages is "to deter, not to destroy." (*Adams v. Murakami* (1991) 54 Cal.3d 105, 112 (*Adams*).) Our role in reviewing an award of

punitive damages is to "determine whether the award is excessive as a matter of law or raises a presumption that it is the product of passion or prejudice." (*Adams, supra,* 54 Cal.3d at pp. 109-110.) "Because the quintessence of punitive damages is to deter future misconduct by the defendant, the key question before the reviewing court is whether the amount of damages 'exceeds the level necessary to properly punish and deter.' [Citation.]" (*Id*. at p. 110.) In determining whether a punitive damage award is excessive under California law, a court must consider (1) the reprehensibility of the defendant's conduct; (2) the amount of compensatory damages or actual harm suffered by the plaintiff; and (3) the defendant's financial condition. (*Ibid*.; *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928.)

The finder of fact has wide discretion in determining what amount of punitive damages is proper. "The California Supreme Court has declined to prescribe any particular standard for assessing a defendant's ability to pay punitive damages [citation], but it has held that actual evidence of the defendant's financial condition is essential. [Citation.] A punitive damages award is based on the defendant's financial condition at the time of trial. [Citations.]" (*Kelly v. Haag* (2006) 145 Cal.App.4th 910, 915.) "What is required is evidence of the defendant's ability to pay the damage award. [Citation.]" (*Robert L. Cloud & Associates, Inc. v. Mikesell* (1999) 69 Cal.App.4th 1141, 1152.)

"While punitive damages must bear a reasonable relation to actual damages, no fixed ratio exists to determine the proper proportion." (*McGee v. Tucoemas Federal Credit Union* (2007) 153 Cal.App.4th 1351, 1361 (*McGee*).) "There is no simple formula for calculating punitive damages in that there is no particular sum that represents the only correct amount for such damages in any given case. Instead, there is a wide range of reasonableness for punitive damages reflective of the fact finder's human response to the evidence presented. [Citation.]" (*McGee, supra,* 153 Cal.App.4th at p. 1362.)

24

Although the calculation of punitive damages is a "'fluid process'" that "'does not involve strict adherence to a rigid formula,'" "punitive damage awards are generally not allowed to exceed 10 percent of the defendant's net worth, and [ ] significantly lower percentages are indeed the norm." (*Storage Services v. Oosterbaan* (1989) 214 Cal.App.3d 498, 515.) "[P]unitive damage awards exceeding 10 percent of a defendant's net worth have generally been disfavored by the appellate courts." (*Goshgarian v. George* (1984) 161 Cal.App.3d 1214, 1228.) The relationship of a punitive damages award to defendant's net worth, however, is not determinative of whether the award is excessive because "'[n]et worth' is subject to easy manipulation and, in our view, it should not be the only permissible standard. Indeed, it is likely that blind adherence to any one standard could sometimes result in awards which neither deter nor punish or which deter or punish too much." (*Lara v. Cadag* (1993) 13 Cal.App.4th 1061, 1065, fn. 3.)

"[A] reduction in compensatory damages does not mandate a corresponding reduction in punitive damages." (*McGee, supra,* 153 Cal.App.4th at p. 1362 [no reduction in $1,200,000 punitive damage award where compensatory damages reduced from $1,990,385 to $750,000].) "'[T]he "most important question is whether the amount of the punitive damages award will have deterrent effect--without being excessive.'" [Citation.]" (*Ibid*.) An award of punitive damages must bear some relation to the award of actual damages, so a significant reduction in compensatory damages may make the punitive damage award "suspect." (*Auerbach v. Great Western Bank* (1999) 74 Cal.App.4th 1172, 1190 [remand $2,600,000 punitive damage award where compensatory damages reduced from $207,155 to $6,750]; see *Krusi v. Bear, Stearns & Co.* (1983) 144 Cal.App.3d 664, 680-681 [remand $50,000 punitive damage award where compensatory damages of $58,940 reduced by $30,000 offset].)

B. *Analysis*

The trial court found Varwig acted with oppression and malice in creating the "tank trap" and awarded $35,000 in punitive damages. The court did not explain how it calculated this amount.

Varwig contends the evidence does not support the award of punitive damages. First, he contends the record does not establish clear and convincing proof that Varwig acted reprehensively or maliciously towards Gill. He asserts the court's finding is based on the "conjecture" that Varwig built a "tank trap." Varwig contends there is no evidence he intentionally dug this trench to trap Gill; he contends there was no evidence to refute his testimony that he simply repaired a broken water pipe.

Again, it was for the trial court as trier of fact to determine the credibility of the witnesses and credit the testimony and weigh the evidence accordingly. (*Sav-On Drug Stores, supra,* 34 Cal.4th at p. 334.) The photographs taken by Varwig that day established that Gill's truck was stuck in a ditch. Varwig admitted he dug that ditch. The trial court clearly believed Gill over Varwig about the intended use of the ditch--to trap Gill. Its belief is supported by the timing of the incident, occurring mere days after Gill cut the barbed wire, another impediment to his passage, as well as Varwig's failure to offer Gill any assistance or even to converse with him about the incident as Varwig photographed Gill's truck. Varwig took multiple photographs of the stuck truck and contacted the sheriff, but these pictures did not show any water from a broken pipe. Nor did they show a broken pipe nor Gill's cutting of the yellow caution tape before he entered the ditch as alleged by Varwig, images that would have corroborated Varwig's version of events. The trial court found the photographs supported Gill's testimony and it was entitled to make that finding.

Substantial evidence supports the trial court's finding that Varwig acted maliciously, that his conduct in creating the "tank trap" was intended to cause injury.

26

That Gill suffered no serious injury was fortuitous, but does not negate a finding of malice.

Varwig next contends the amount of punitive damages is excessive. He contends the $35,000 award is more than 10 percent of his net worth, which the bifurcated trial showed to be $210,000 ($740,000 in assets less $530,000 in liabilities). The Gills challenge this figure. They claim the value of Varwig's residence is $650,000, as shown on his 2008 loan application, instead of the recent assessed value of $468,452, and the value of Lots 23 and 25 is the amount Varwig paid for them ($440,000) rather than his current estimate of $250,000. They further challenge defense counsel's suggestion that the economic downturn affected land values; "such is simply not the case."

Varwig has failed to show the award of punitive damages was excessive. Even after the reductions to the award of compensatory damages, the punitive damage award of $35,000 is only a fraction of the actual damages, which exceed $75,000. The evidence of Varwig's net worth, particularly the value of his properties, was in dispute. It was the role of the trial court, as the fact finder, to resolve the dispute. Further, "[n]et worth is too easily subject to manipulation to be the sole standard for measuring a defendant's ability to pay. [Citation.]" (*Zaxis Wireless Communications, Inc. v. Motor Sound Corp.* (2001) 89 Cal.App.4th 577, 582.) We find no abuse of discretion in the punitive damage award.

VII

*Attorney Fees*

A. *The Law*

"California follows what is commonly referred to as the American rule, which provides that each party to a lawsuit must ordinarily pay his own attorney fees. [Citations.]" (*Trope v. Katz* (1995) 11 Cal.4th 274, 278.) "Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties . . . ."

27

(Code Civ. Proc., § 1021.)  Where attorney fees are authorized by statute, such fees are recoverable as costs.  (Code Civ. Proc., § 1033.5, subd. (a)(10)(B).)

One exception to the general rule set forth in Code of Civil Procedure section 1021 is Code of Civil Procedure  section 1021.9 (section 1021.9).  Section 1021.9 provides: "In any action to recover damages to personal or real property resulting from trespassing on lands either under cultivation or intended or used for the raising of livestock, the prevailing plaintiff shall be entitled to reasonable attorney's fees in addition to other costs, and in addition to any liability for damages imposed by law."  (Code Civ. Proc., § 1021.9.)

"We must construe the language of a statute in accordance with the ordinary plain meaning of the language used.  '"The rules governing statutory construction are well settled.  We begin with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. [Citations.]  'In determining intent, we look first to the language of the statute, giving effect to its "plain meaning."'" [Citations.]  Although we may properly rely on extrinsic aids, we should first turn to the words of the statute to determine the intent of the Legislature.  [Citation.]  Where the words of the statute are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history." [Citation.] [¶]  "If the statutory language is clear and unambiguous, there is no need for construction." [Citation.]'  [Citation.]"  (*The TJX Companies, Inc. v. Superior Court* (2008) 163 Cal.App.4th 80, 86.)  "Exceptions to the general provisions of a statute are to be narrowly construed; only those circumstances that are within the words and reason of the exception may be included.  [Citation.]"  (*Corbett v. Hayward Dodge, Inc*. (2004) 119 Cal.App.4th 915, 921.)

The legislative history of section 1021.9 indicates its purpose was to "impose liability for *all property damage*" caused by trespass onto certain lands.  (*Starrh and*

28

*Starrh Cotton Growers v. Aera Energy LLC* (2007) 153 Cal.App.4th 583, 608, italics added.)

B. *Analysis*

On cross-appeal, the Gills contend the trial court erred in denying their motion for attorney fees under section 1021.9. They argue the court erred in requiring both notice of the request for fees in the complaint and damage to the crops under cultivation as prerequisites to an award of fees. As to the latter point, they contend their actual damages, expenses and damages for loss of use of the easement, are sufficient. We conclude the trial court properly denied the motion for attorney fees because section 1021.9 is inapplicable to this case.

This action does not fall within the plain language of section 1021.9. Section 1021.9 requires an "action to recover damages to personal or real property resulting from trespassing on lands . . . under cultivation." First, there was no trespass. Varwig did not trespass on the Gills' property that was under cultivation. The Gills contend Varwig trespassed on their easement. They assert that Varwig's interference with their easement constituted a trespass because " '[t]respass to property is the unlawful interference with its possession.' [Citation.]" (*Elton v. Anheuser-Busch Beverage Group, Inc*. (1996) 50 Cal.App.4th 1301, 1306.) The Gills, however, did not have a possessory interest in the easement. "An easement gives a nonpossessory and restricted right to a specific use or activity upon another's property, which right must be less than the right of ownership. [Citation.]" (*Mehdizadeh v. Mincer* (1996) 46 Cal.App.4th 1296, 1306.) Interference with an easement is a nuisance, not a trespass. (*Moylan, supra,* 181 Cal.App.3d at p. 574.)

Our Supreme Court explained the difference between a nuisance and a trespass in *Wilson v. Interlake Steel Co*. (1982) 32 Cal.3d 229 (*Wilson*), quoting Dean Prosser at page 233: "'The distinction which is now accepted is that trespass is an invasion of the plaintiff's interest in the exclusive possession of his land, while nuisance is an

29

interference with his use and enjoyment of it.'"  The *Wilson* court continued:  "In similar fashion, the distinction is succinctly expressed in comment d to section 821D of the Restatement Second of Torts: 'A trespass is an invasion of the interest in the exclusive possession of land, as by entry upon it.  . . . .  A nuisance is an interference with the interest in the private use and enjoyment of the land and does not require interference with the possession.'  [Citation.]"  (*Wilson, supra,* 32 Cal.3d at p. 233.)  Because trespass requires that the plaintiff have exclusive possession of the land, "[a] tenant in common cannot trespass on the commonly owned property."  (*Kapner v. Meadowlark Ranch Assn.* (2004) 116 Cal.App.4th 1182, 1189.)

Second, although the Gills' action sought to recover certain damages, it did not seek recovery for "damages *to* personal or real property."  Instead, the action sought to recover for damage to the easement, which is not real property.  An easement is an intangible property interest to use another's land (or to prevent the owner's use of his land), but it does not create an interest in the land itself.  (6 Miller & Starr, Cal. Real Estate, *supra*, Easements, § 15:5, pp. 15-19-15-20.)  Damage to or interference with an easement is not property damage.  (See *Kazi v. State Farm Fire & Cas. Co.*, *supra*, 24 Cal.4th 871, 881 [easement disputes are not within "property damage" coverage because they involve intangible property rights and economic losses only].)

The Gills complain that it is unfair that they are denied attorney fees simply because they mitigated damages by obtaining alternate access to their property so they could harvest their vineyards.  They argue they should not be penalized because they did not allow Varwig's conduct to damage their grape crop.  "Our duty as a court is to apply the governing statutes as written to the facts of the case before us, not to rewrite the statutes to make them more just or fair in particular circumstances.  [Citations.]"  (*Thornton v. California Unemployment Ins. Appeals Bd.* (2012) 204 Cal.App.4th 1403, 1419.)

**DISPOSITION**

The portion of the judgment that decrees a public right of way is reversed. The award of $72,300 in damages for loss of use of the easement is reduced by $9,100 to $63,200. The award of $50,000 in damages for emotional distress is reversed. As modified, the judgment is affirmed. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3).)

                                                                      _____DUARTE_____, J.

We concur:

_____MAURO_____, Acting P. J.

_____HOCH_____, J.